**Opinion issued June 25, 2015.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00102-CV

———————————

**NAVARRO COUNTY WHOLESALE RATEPAYERS; M.E.N. WATER SUPPLY CORPORATION; ANGUS WATER SUPPLY CORPORATION; CHATFIELD WATER SUPPLY CORPORATION; CORBET WATER SUPPLY CORPORATION; CITY OF BLOOMING GROVE; CITY OF FROST; CITY OF KERENS; AND COMMUNITY WATER COMPANY,** Appellants

**V.**

**ZACHARY COVAR, EXECUTIVE DIRECTOR OF THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, ITS COMMISSIONERS, BRYAN SHAW, CARLOS RUBENSTEIN AND TOBY BAKER, AND CITY OF CORSICANA,** Appellees

**On Appeal from the 419th District Court**
**Travis County, Texas[1]**

---

[1] Pursuant to its docket equalization authority, the Supreme Court of Texas transferred the appeal to this Court. *See* Misc. Docket No. 14-001 (Tex. Jan. 7,

## MEMORANDUM OPINION

This is an administrative law case in which the plaintiffs, wholesale purchasers of water from the City of Corsicana, challenge the trial court's judgment affirming an order by the Texas Commission on Environmental Quality that dismissed their rate appeal. At issue was whether the plaintiffs, pursuant to 30 TEX. ADMIN. CODE § 291.133, carried their burden to show that the protested rate "adversely affected the public interest." We affirm.

## BACKGROUND

**The Parties and the Contracts**

The City of Corsicana is the regional water provider in Navarro County and provides service to over 11,000 retail customers and 21 wholesale customers. Plaintiffs are eight of Corsicana's wholesale customers [collectively, "the Ratepayers"]. Of Corsicana's 11,000 retail customers, 9,000 are residential retail customers. The average water use of a residential retail user is less than 6,000 gallons per month. In contrast, each of the wholesale ratepayers purchases over 1,000,000 gallons of water per month, which it then resells to its own retail customers.

---

2014); *see also* TEX. GOV'T CODE ANN. § 73.001 (West 2013) (authorizing transfer of cases).

Corsicana sells water to the Ratepayers pursuant to individual contracts. Since the 1960s, the contracts have given Corsicana the right to raise its rates. In 2001, Corsicana created a "standard contract," which was intended to be used whenever a wholesale customer amended its contract. Seven of the Ratepayers— M.E.N. Water Supply Corporation, Angus Water Supply Corporation, Chatfield Water Supply Corporation, Corbet Water Supply Corporation, City of Frost, and Community Water Company—entered into the standard contract. Two of the Ratepayers—City of Blooming Grove and City of Kerens—did not. The standard contract provides the following regarding rate changes:

> Section 4.02. The rates stated in the contract are the prevailing rates which "may be changed or modified from time to time by Seller in accordance with Section 4.03 of this Contract during the time it remains in effect.

> Section 4.03. Rate Revision. Purchaser acknowledges and agrees that Seller's city council has the right to revise by ordinance, from time to time and as needed, the rates charged hereunder to cover all reasonable, actual, and expected costs incurred by Seller to provide the potable water supply service to Seller's customers. Except as provided in subsection b below, if, during the term of this contract, Seller revises its minimum inside city retail water rate, then such revised rate shall likewise apply to water usage by Purchaser under this Contract.

Early versions of the contracts in the 1960s and 1970s charged all customers on a declining block rate, i.e., a rate in which the price per 1,000 gallons decreases as usage increases. Later, Corsicana used a flat volumetric rate for all customers. From 2006 to 2008, Corsicana raised its volumetric rate from $2.14 per 1,000

3

gallons to $3.00 per 1,000 gallons. Nevertheless, by 2008, Corsicana's "Utility Fund," which is comprised of revenues and expenses from its water and wastewater utilities had a $1 million shortfall. Because Corsicana does not operate on credit, it must have a cash reserve available to cover potential shortfalls and emergencies.

**The 2009 Rate Increase**

One of the ways that Corsicana sought to increase its Utility Fund was to raise its water rates. Under the rate adopted, Corsicana charges each of its customers—both wholesale and retail—a monthly base rate that is determined by the size of the customer's meter. The base rates range from $17.60 for a 5/8- or 3/4-inch meter to $1,695.52 for a 10-inch meter. Regardless of the meter size, the base rate includes the first 1,000 gallons used per month. For water use in excess of 1,000 gallons per month, Corsicana charges tiered volumetric rates, in inclining blocks. The volumetric rate is $3.00 per 1,000 gallons for 1-10,000 gallons; $3.15 per 1,000 gallons for 10,001-25,000 gallons; and $3.25 per 1,000 gallons for over 25,000 gallons.

**The Ratepayers' Appeals**

Arguing that the 2009 rate increase disproportionately affected wholesale ratepayers when compared to residential retail ratepayers, the Ratepayers appealed Corsicana's rate change by filing a Petition with the Texas Commission on

4

Environmental Quality ["the Commission"]. The Commission referred the case to the State Office of Administrative Hearings ["SOAH"], where an Administrative Law Judge ["ALJ"] conducted a hearing to determine whether the rate change "affected a public interest." *See* 30 TEX. ADMIN. CODE §§ 291.131-.133. After the hearing, the ALJ issued a Proposal for Decision ["PFD"] and a proposed order finding that the Ratepayers failed to show that the 2009 rate increase adversely affected the public interest. After considering the ALJ's PFD, the Commission agreed that the Ratepayers had failed to show that the rate change adversely affected the public interest, holding that "[t]he public-interest inquiry set out in 30 TAC § 291.133(a)(1)-(4) does not include a comparison of the protested rate's impacts on wholesale and retail customers." The Ratepayers then appealed to the Travis County District Court, which affirmed the Commission's order dismissing the rate appeal. This appeal followed.

## PROPRIETY OF COMMISSION'S "PUBLIC INTEREST" RULING

In four issues on appeal, the Ratepayers contend that:

1. Rate discrimination must be considered in a public interest hearing;

2. If the Commission correctly interpreted the public interest rules to preclude consideration of rate discrimination, the rules are invalid;

3. Corsicana's wastewater subsidy is not a "cost of service" issue; and

5

4. Corsicana's Utility Fund deficit is not a "changed condition" that may be considered under 30 TAC § 291.133(a)(3)(B) or a factor that supports Corsicana's 2009 Rate Increase.

**Standard of Review**

The substantial-evidence standard of the Texas Administrative Procedure Act ("APA") governs our review of the Commission's final order. *See* TEX. GOV'T CODE ANN. § 2001.174 (West 2008). The APA authorizes reversal or remand of an agency's decision that prejudices the appellant's substantial rights because the administrative findings, inferences, conclusions, or decisions (1) violate a constitutional or statutory provision, (2) exceed the agency's statutory authority, (3) were made through unlawful procedure, (4) are affected by other error of law, or (5) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *Id.* § 2001.174(2)(A)-(D), (F). Otherwise, we may affirm the administrative decision if we are satisfied that "substantial evidence" exists to support it. *Id.* § 2001.174(1), (2)(E).

We review the agency's legal conclusions for errors of law and its factual findings for support by substantial evidence. *Heat Energy Advanced Tech., Inc. v. W. Dallas Coal. for Envtl. Justice*, 962 S.W.2d 288, 294–95 (Tex. App.—Austin 1998, pet. denied). Substantial evidence "does not mean a large or considerable

6

amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact." *Lauderdale v. Tex. Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ) (quoting *Pierce v. Underwood*, 487 U.S. 552, 564–65, 108 S. Ct. 2541 (1988)) (internal quotation marks omitted). We consider the reliable and probative evidence in the record as a whole when testing an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence. *Graff Chevrolet Co. v. Texas Motor Vehicle Bd.*, 60 S.W.3d 154, 159 (Tex. App.—Austin 2001, pet. denied); *see* TEX. GOV'T CODE ANN. § 2001.174(2)(E). We presume that the Commission's order is supported by substantial evidence, and the Ratepayers bear the burden of proving otherwise. *See Tex. Health Facilities Comm'n v. Charter Med.–Dallas, Inc.*, 665 S.W.2d 446, 453 (Tex. 1984). The burden is a heavy one—even a showing that the evidence preponderates against the agency's decision will not be enough to overcome it, if there is some reasonable basis in the record for the action taken by the agency. *Id.* at 452. Our ultimate concern is the reasonableness of the agency's order, not its correctness. *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984).

To the extent that appellants' issues address the construction of the Commission's rules, we review these questions de novo. *Rodriguez v. Serv. Lloyds*

*Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). In general, "[w]e construe administrative rules, which have the same force as statutes, in the same manner as statutes." *Id.*; *see also State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006) (addressing statutory construction). "Unless the rule is ambiguous, we follow the rule's clear language." *Rodriguez*, 997 S.W.2d at 254 (citation omitted). "If there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, . . . we normally defer to an agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule." *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011).

Whether the agency's order satisfies the substantial-evidence standard is a question of law. *Id.* Thus, the district court's judgment that there was substantial evidence supporting the Commission's final order is not entitled to deference on appeal. *See Tex. Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam). On appeal from the district court's judgment, the focus of the appellate court's review, as in the district court, is on the agency's decision. *See Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000); *Tave v. Alanis*, 109 S.W.3d 890, 893 (Tex. App.—Dallas 2003, no pet.).

**Applicable Principles of Law**

The Commission's jurisdiction in this case arose from Sections 11.036 and 11.041 of the Texas Water Code, which provide:

(a) A person . . . having in possession and control any storm water, floodwater, or rainwater that is conserved or stored as authorized by this chapter may contract to supply the water to any person . . . having the right to acquire use of the water.

(b) ***The price and terms of the contract shall be*** just and reasonable and ***without discrimination*** . . . .

TEX. WATER CODE ANN. § 11.036(a)-(b). (Vernon 2008) (emphasis added).

(a) Any person entitled to receive or use water . . . from any conserved or stored supply may present to the commission a written petition showing:
(1) that he is entitled to receive or use the water;
(2) that he is willing and able to pay a just a reasonable price for the water;
(3) that the party owning or controlling the water supply has water not contracted to others and available for the petitioner's use; and
(4) that the party owning or controlling the water supply fails or refused to supply the available water to the petitioner, ***or that the price or rental demanded for the available water*** is not reasonable and just or ***is discriminatory***.

TEX. WATER CODE ANN. § 11.041(a) (Vernon Supp. 2014) (emphasis added).

In *Texas Water Comm'n v. City of Fort Worth*, 875 S.W.2d 332, 335 (Tex. App.—Austin 1994, writ denied), the court recognized that the Texas Constitution limits the State's ability to pass laws that impair contractual obligations to instances wherein the public safety and welfare must be protected. The court then held that before the Commission could modify a rate set by contract, the Commission must first make a finding that the challenged rates "adversely affect the public interest by being unreasonably preferential, prejudicial, or discriminatory." *Id.* at 336.

9

In the wake of the *City of Fort Worth* case, the Commission adopted the wholesale-service rules found in Subchapter I of Chapter 291 of the Texas Administrative Code, which are applicable to this case because it involves a petition to review rates charged for the sale of water for resale. *See* 30 TEX. ADMIN. CODE §§ 291.128-291.138. The wholesale service rules set up a two-step process for reviewing challenged rates set by contract: (1) there must be a determination that a public interest is adversely affected, and only if such a public interest is found; 2) will the Commission review the rate. *Id.*

For a petition to review a rate that is charged pursuant to a written contract, the executive director of the Commission will forward the petition to SOAH to conduct a hearing on public interest, and SOAH will conduct an evidentiary hearing to determine whether the protested rate adversely affects the public interest. 30 TEX. ADMIN. CODE §§ 291.131(b), 291.132(a). The ALJ then prepares a proposal for decision and order with proposed findings of fact and conclusions of law concerning whether the protested rate adversely affects the public interest and submits this recommendation to the commission. 30 TEX. ADMIN. CODE § 291.132(c). The Commission determines whether the challenged rate adversely affects the public interest by applying section 291.133 of the Administrative Code, which provides as follows:

> (a) the commission shall determine the protested rate adversely affects the public interest if after the evidentiary hearing on public

interest the commission concludes at least one of the public interest criteria have been violated:

(1) the protested rate impairs the seller's ability to continue to provide service, based on the seller's financial integrity and operational capability;

(2) the protested rate impairs the purchaser's ability to continue to provide service to its retail customers, based on the purchaser's financial integrity and operational capability;

(3) the protested rate evidences the seller's abuse of monopoly power in its provision of water or sewer service to the purchaser. In making this inquiry, the commission shall weigh all relevant factors. The factors may include:

(A) the disparate bargaining power of the parties, including the purchaser's alternative means, alternative costs, environmental impact, regulatory issues, and problems of obtaining alternative water or sewer service;

(B) the seller's failure to reasonably demonstrate the changed conditions that are the basis for a change in rates;

(C) the seller changed the computation of the revenue requirement or rate from one methodology to another;

(D) where the seller demands the protested rate pursuant to a contract, other valuable consideration received by a party incident to the contract;

(E) incentives necessary to encourage regional projects or water conservation measures;

(F) the seller's obligation to meet federal and state wastewater discharge and drinking water standards;

(G) the rates charged in Texas by other sellers of water or sewer service for resale;

(H) the seller's rates for water or sewer service charged to its retail customers, compared to the retail rates the purchaser charges its retail customers as a result of the wholesale rate the seller demands from the purchaser;

(4) the protested rate is unreasonably preferential, prejudicial, or discriminatory, compared to the wholesale rates the seller charges other wholesale customers.

(b) The commission shall not determine whether the protested rate adversely affects the public interest based on an analysis of the seller's cost of service.

30 TEX. ADMIN. CODE § 291.133.

The public interest does not require that a wholesale rate be equal to the seller's cost of providing that service, thus a cost-of-service analysis is inappropriate unless and until the Commission determines that the challenged rate affects a public interest. *See* 30 TEX. ADMIN. CODE § 291.133(b). The petitioner has the burden of proof in a public-interest hearing. *Id.* at § 291.136.

In their petition, the Ratepayers relied only upon § 291.133(a)(3), arguing that Corsicana's rate evidences its abuse of monopoly power.

**Disparate Treatment between Retail Customers and Wholesale Customers**

In two related issues on appeal, the Ratepayers contend that the Commission erred in deciding that rate discrimination cannot be considered in the public interest analysis under § 291.133, and that, if § 291.133 does in fact preclude consideration of rate discrimination, the rule is contrary to statutory authority.

Critical to the Ratepayers argument is their own definition of rate discrimination as "the disparate treatment of retail and wholesale customers."

In his proposal for decision, the ALJ concluded that "the public-interest inquiry is limited to the factors set out in 30 TAC § 291.133(a)(1)-(4). It does not include a comparison of protested rate's impacts on wholesale and retail customers." The Commission's final order did not limit the public interest inquiry to the factors set out in § 291.133(a), but did agree that "[t]he public-interest inquiry set out in 30 TAC § 291.133(a)(1)-(4) does not include a comparison of the protested rate's impacts on wholesale and retail customers."

We agree that the factors listed in § 291.133(a)(3) are non-exclusive, and other factors may be considered if appropriate. Section 291.133(a)(3) provides that when determining whether the seller has abused its monopoly power, "the commission shall weigh all relevant factors[,] which "may include" the eight factors specifically set forth in the rule. *See* 30 TEX. ADMIN. CODE § 291.133(a)(3)(A-H). The use of the word "may" "creates discretionary authority or grants permission or a power." *See* TEX. GOV'T CODE ANN. § 311.016 (Vernon 2013). Nothing in the rule limits the Commission to considering only the factors listed, and indeed, the Commission is not required to consider all of the factors listed, only those that are relevant. However, the fact that the Commission may

13

consider factors other than those listed does not answer the question of whether it should have done so in this case.

The issue before this Court is not—as the Ratepayers argue—whether the trial court refused to consider rate discrimination as a factor. It clearly did not refuse to consider rate discrimination because the very purpose behind a public interest hearing is to determine whether the challenged contractual rate "adversely affect[s] the public interest by being unreasonably preferential, prejudicial, or discriminatory." *City of Fort Worth*, 875 S.W.2d at 336. The issue, properly framed, is whether the Commission must consider the disparate impact of a rate change on wholesale and retail customers as a factor when determining whether there has been an abuse of monopoly power by the seller under § 291.133(a)(3).

The Ratepayers base their rate discrimination argument on language found in the preamble to the Commission's adoption of the Wholesale Water or Sewer Service Rules, specifically focusing on 30 TEX. ADMIN. CODE § 291.133(a)(3)(A-H), the abuse of monopoly power provision that is the basis for the Ratepayers' petition. The portion of the preamble relied on by Ratepayers provides as follows:

> One commenter argued that the public interest criteria in § 291.133(a)(4) should concern unreasonable discrimination between customers, but should only focus on wholesale customers. The commission agrees that a comparison of the protested rate with rates the seller charges other wholesale customers is relevant to the public interest inquiry, and the statutory language gives sufficient guidance concerning the scope of the inquiry. ***The public interest inquiry under paragraph § 291.133(a)(3) should sufficiently cover whether***

14

> *any disparity in treatment between retail and wholesale customers adversely affects the public interest.* Accordingly, the adopted rules includes a revised paragraph § 291.133(a)(4) which uses the statutory language found in the Water Code, § 13.047(j), that the rate shall not be unreasonably preferential, prejudicial, or discriminatory and specifies that under the subsection the inquiry shall be limited to a comparison of seller's rates charged to wholesale customers. A commenter argued that § 291.133(a)(4) imposed an unlawful standard to determine the public interest because the subsection inquired concerning the mere appearance of discrimination, as opposed to the existence of discrimination. This issue has been resolved by the adopted changes which inquire whether the protested rate is unreasonable preferential, prejudicial, or discriminatory.

19 Tex. Reg. 6229 (1994) (emphasis added). The Ratepayers argue that the highlighted sentence in the preamble above is proof that § 291.133(a)(3)—the abuse-of-monopoly power section—is intended to consider disparate treatment of wholesale and retail customers as a factor in an abuse-of-monopoly power analysis even though that factor is not one of those listed.

Corsicana responds that, taken in context, the preamble does not support an expansion of the factors listed in §291.133(a)(3) to include a consideration of the disparate impact of a rate change on retail and wholesale customers. We agree with Corsicana.

The portion of the preamble relied upon by the Ratepayers was in response to comments submitted regarding the original proposed version of § 291.133(a)(4), which provided that the public interest would be violated if:

> The protested rate appears to discriminate between the purchaser and others who purchase water or sewer service from the seller, and the seller does not provide reasonable support for such discrimination.

19 Tex. Reg. 3899 et seq. (1994). As originally proposed, section 291.133(a)(4) would have permitted the analysis the Ratepayers urge here, i.e., a comparison of the impact of a protested rate on wholesale and retail customers and whether such disparate treatment was discriminatory. However, the commenter suggested that this analysis should be confined to comparing the treatment of wholesale customers, and the Commission agreed, stating in the preamble that "a comparison of the protested rate with rates the seller charges other wholesale customers is relevant to the public interest inquiry." Therefore, in response to the comment to the originally proposed § 291.133(a)(4), the Commission adopted the current version, which provides that the public interest criteria has been violated if:

> [t]he protested rate is unreasonably preferential, prejudicial, or discriminatory, compared to the wholesale rates the seller charges other wholesale customers.

30 TEX. ADMIN. CODE § 291.133(a)(4). If we were to interpret § 291.133(a)(3) to include a comparison of the impact of a rate on wholesale and retail customers, it would effectively negate the change that the Commission made to § 291.133(a)(4), which was intended to narrow the comparison to consider the effect as between wholesale customers only.

16

Our conclusion that § 291.133(a)(3) does not include a comparison of the impact of the rate on wholesale versus retail customers is supported by looking at the terms of § 291.133(a)(3) itself. One of the factors that is listed requires a comparison of "the seller's rates for water or sewer service charged to its retail customers, compared to the retail rates the purchaser charges its retail customers as a result of the wholesale rates the seller demands from the purchase." 30 TEX. ADMIN. CODE § 291.133(a)(3)(H). In other words, the Commission determines whether the rate unfairly discriminates against wholesalers by comparing the rate Corsicana charges its own retail customer with the rate that the Ratepayer charge their retail customers as a result of the wholesale rate it pays Corsicana. This analysis compares "apples to apples" by looking at whether Corsicana favors its own retail customers at the expense of the Ratepayers' retail customers, thereby recognizing that the Ratepayers' costs of acquiring the water will eventually be passed along to its own retail customers. In other words, if the Ratepayers' customers pay the same or less than Corsicana's own retail customers, that factors weighs against a finding that the contracted for rate is discriminatory.

At the public interest hearing, there was evidence that, assuming an average 6,000 gallon use per month, an average retail customer pays the Ratepayers $3.45 or less per 1,000 gallons of water due to the wholesale rate that Corsicana charges the Ratepayers, while Corsicana's own average retail customer pays Corsicana an

17

average of $5.43 per 1,000 gallons.[2]  As such, the Ratepayers' retail customers actually pay less for water than Corsicana's own retail customers.

Also, we note that the public interest rule requires the Commission to determine whether the protested rate adversely affects the public interest. Corsicana's rates are the same for both retail and wholesale customers.  The difference in the impact of the rate is attributable to water usage, not the customer's status as a wholesale or retail customer.  Indeed, there was evidence that 31 of Corsicana's 50 highest volume water customers were retail customers who paid the same higher rates as the wholesale customers.  Thus, the Ratepayers claim that the disputed rate treats wholesale and retail customers differently is not supported by the record.

The Ratepayers also point to a comment by Corsicana's mayor as evidence of Corsicana's intent to discriminate against wholesale buyers.  When questioned about why Corsicana adopted an inclining block volumetric rate, there was evidence that the Mayor responded that it was because the wholesale customers "don't vote."  However, the mayor's individual mental process, subjective knowledge, or motive is irrelevant to a legislative act of Corsicana's city counsel. *See City of Corpus Christi v. Bayfront Assocs., Ltd.*, 814 S.W.2d 98, 105 (Tex.

---

[2]  This difference is largely attributable to the fact that the Ratepayers are able to apportion their base rate among their retail customers.  Thus, the base rate by the Ratepayers' retail customer is less than the base rate paid by Corsicana's own retail customers even though their volumetric rate may be higher.

App.—Corpus Christi 1991, writ denied) (stating that "an individual city council member's mental process, subjective knowledge, or motive is irrelevant to a legislative act of the city, such as the passage of an ordinance"); *Mayhew v. Town of Sunnyvale*, 774 S.W.2d 284, 298 (Tex. App.— Dallas 1989, writ denied) ("These principles are consistent with the basic doctrine that the subjective knowledge, motive, or mental process of an individual legislator is irrelevant to a determination of the validity of a legislative act because the legislative act expresses the collective will of the legislative body.").

In related issue two, the Ratepayers argue that "[i]f the Commission correctly interpreted the public interest rules to preclude consideration of rate discrimination, the rules are invalid." However, the Commission did not conclude that rate discrimination was irrelevant; instead it decided that comparing the disparate impact of a rate on wholesale versus retail customers was not a proper consideration for determining rate discrimination.

We agree with the Commission that "[t]he public-interest inquiry set out in 30 TAC § 291.133(a)(1)-(4) does not include a comparison of the protested rate's impacts on wholesale and retail customers." The rule, as written, adequately addresses the issue of rate discrimination by comparing (1) the treatment of wholesale customers to other wholesale customers [in § 291.133(a)(4)] and (2) the treatment of the seller's own retail customers to the wholesale buyer's retail

19

customers [in § 291.133(a)(3)(H)]. The Commission did not err by deciding that a comparison of the impact of the challenged rate on wholesale as opposed to retail customers was inappropriate.

Accordingly, we overrule issues one and two.

**"Cost of Service" Issues**

When the Commission sets utility rates, the rates are based on the utility's cost of rendering service; two components of cost of service are allowable expenses and return on invested capital. 30 TEX. ADMIN. CODE § 291.31(a). "Only those expenses that are reasonable and necessary to provide service to the ratepayer may be included in the allowable expenses." 30 TEX. ADMIN. CODE § 291.31(b). "The commission shall not determine whether the protested rate adversely affects the public interest based on an analysis of the seller's cost of service." 30 TEX. ADMIN. CODE § 291.133(b). A cost-of-service analysis is inappropriate unless and until the Commission determines that the challenged rate affects a public interest. *Id*. Therefore, cost-of-service evidence is irrelevant to determining whether a protested rate adversely affects the public interest.

*The "Wastewater Subsidy" Evidence*

The Ratepayers claim that Corsicana adopted the protested water rates to shift a shortfall in its wastewater service revenue to its out-of-city wholesale water customers. They claim that a shortfall in Corsicana's Utility Fund, which is

20

comprised of revenues and expenses from both its water and wastewater utilities, was due to its rates for wastewater utility service being too low to cover the expenses of wastewater service. The gist of the Ratepayers' claim is that the rates they pay are actually subsidizing Corsicana's wastewater service *and are not necessary and reasonable to provide water service to them.*

In issue three, the Ratepayers contend the Commission erred in deciding that their "wastewater subsidy" argument and evidence proffered in support thereof was a cost-of-service issue and could not be considered as part of its public interest analysis. We disagree. In order for the Commission to determine whether there was in fact a subsidy, it would necessarily have to examine the costs and revenues of both the water and wastewater services, because both are combined in the Utility Fund. Section 291.133(b) clearly prohibits such an inquiry. Thus, we conclude that the Commission properly refused to consider the Ratepayers' "wastewater subsidy" evidence and argument in conducting its public interest analysis.

We overrule issue three.

*The "Changed Conditions" Issue*

One of the factors that the Commission may consider in determining whether there has been abuse of monopoly power affecting the public interest is "the seller's failure to reasonably demonstrate that changed conditions are the basis

21

for a change in rates[.]" 30 TEX. ADMIN. CODE § 291.133(a)(3)(B). At the hearing, Corsicana presented evidence of "changed conditions," i.e., the fact that its Utility Fund had a $1 million shortfall and that Corsicana needs a cash reserve available to deal with emergencies. In issue four, the Ratepayers contend that the Commission erred by considering the Utility Fund deficit as a changed condition while excluding consideration of its "wastewater deficit" as prohibited cost-of-service evidence. We disagree.

The "wastewater subsidy" argument would have required the Commission to delve into the cause of the Utility Fund deficit, which would necessarily have required consideration of the costs of service of both water and wastewater services. However, in considering the Utility Fund as a "changed circumstance," the fact of the deficit, not its cause, is important. Indeed, in its proposal for decision, the ALJ noted that there were several possible causes for the Utility Fund deficit:

> It is certainly possible that the deficit in the Utility Fund was cause wholly or partially by water-service rates that were too low to cover the cost of providing that service. The deficit could also have been caused in whole or in party by sewer service rates that were too low or by unreasonably high water or sewer expenses, or both. Drilling down further, it might be that the deficit in the Utility Fund was due to rates for certain types of customers being lower than the cost of serving them while other customers paid rates that were sufficient to cover the cost of their service. However, those are all cost-of-service issues that are outside the scope of the current proceeding to determine whether the protested rates adversely affect the public interest.

> Regardless of its cause or causes, the uncontradicted evidence shows that the shortfall in the Utility Fund existed at the time Corsicana raised its water rates. Since the evidence also shows that an operating reserve is necessary to pay for emergencies and shortfalls in the cost of providing water service and that the Utility Fund served as Corsicana's operating reserve for that purpose, the ALJ concludes that the deficit in the Utility Fund, regardless of its cause or causes, was a changed condition that gave Corsicana a reasonable basis for increasing its water rates.

The Commission agreed with the ALJ, stating that "[t]he $1 million deficit in Corsicana's Utility Fund, regardless of its cause or causes, was a changed condition that gave Corsicana a reasonable basis for increasing its water rates." Because considering the depleted Utility Fund as a changed circumstance did not require an inquiry into the cause of its deficit, whereas the "wastewater subsidy" argument did, the ALJ and the Commission did not run afoul of the prohibition against "cost-of-service" evidence in considering it, and in concluding that Corsicana had shown changed circumstances justifying its challenged rate.

We overrule issue four.

## CONCLUSION

We affirm the trial court's judgment.


                                        Sherry Radack
                                        Chief Justice


Panel consists of Chief Justice Radack and Justices Brown and Lloyd.

23